NOT DESIGNATED FOR PUBLICATION

STATE OF LOUISIANA       *       NO. 2019-KA-0047

VERSUS       *

      COURT OF APPEAL

DARYL LEESON       *

      FOURTH CIRCUIT

      *

      STATE OF LOUISIANA

* * * * * * *

APPEAL FROM
CRIMINAL DISTRICT COURT ORLEANS PARISH
NO. 539-122, SECTION "G"
Honorable Byron C. Williams, Judge
* * * * * *
**Judge Paula A. Brown**
* * * * * *
(Court composed of Chief Judge James F. McKay, III, Judge Joy Cossich Lobrano,
Judge Paula A. Brown)

**MCKAY, C.J., CONCURS WITH REASONS**
**LOBRANO, J., CONCURS IN PART, DISSENTS IN PART, AND ASSIGNS**
**REASONS.**

Leon Cannizzaro,
DISTRICT ATTORNEY OF ORLEANS PARISH
Irena Zajickova
Donna Andrieu,
DISTRICT ATTORNEY'S OFFICE, ORLEANS PARISH
619 S. White Street
New Orleans, LA 70119

      COUNSEL FOR APPELLEE

Sherry Watters
LOUISIANA APPELLATE PROJECT
P. O. Box 58769
New Orleans, LA 70158

Autumn A. Town
LAW OFFICE OF AUTUMN TOWN, LLC
700 Camp Street
New Orleans, LA 70130

Graham L. Bosworth
LAW OFFICE OF GRAHAM BOSWORTH, LLC
700 Camp Street
New Orleans, LA 70130

     COUNSEL FOR APPELLANT

**CONVICTION AND SENTENCE FOR ATTEMPTED SIMPLE BURGLARY OF AN INHABITED DWELLING VACATED; JUDGMENT OF GUILTY OF UNAUTHORIZED ENTRY OF AN INHABITED DWELLING RENDERED; REMANDED TO THE DISTRICT COURT FOR SENTENCING**

**July 17, 2019**

This is a criminal appeal in which Defendant, Daryl J. Leeson, seeks review of his conviction of attempted simple burglary of an inhabited dwelling. For the reasons that follow, we vacate and set aside Defendant's conviction and sentence of attempted simple burglary of inhabited dwelling, but find the record supports that Defendant is guilty of unauthorized entry of inhabited dwelling, and remand the case to the district court for sentencing on the modified judgment.

## PROCEDURAL HISTORY

On December 20, 2017, the State charged Defendant, in a bill of information, with a felony, simple burglary of an inhabited dwelling - a violation of La. R.S. 14:62.2, and a misdemeanor, simple criminal damage to property less than $500.00 - a violation of La. R.S. 14:56 (A)(1) and (B)(1).[1]

---

[1] The State improperly joined, in the same charging instrument, the felony, simple burglary of an inhabited dwelling, and the misdemeanor, simple criminal damage to property less than $500.00, as these charges are triable by different modes; the felony was triable by a six-person jury, and the misdemeanor was triable by a bench trial. La. C.Cr.P. arts. 493, 779(B), and 782(A); La. Const. art. I, § 17. Defendant, however, does not complain about the error on appeal, and the record before this Court does not reflect Defendant filed a motion to quash the bill of information based on the misjoinder; thus, he waived any objection to the error. La. C.Cr.P. art. 495.

1

The State proceeded to a jury trial only on the felony, simple burglary of an inhabited dwelling.[2] Following the one-day jury trial, on June 12, 2018, the jury returned a compromise verdict, and Defendant was found guilty of the responsive verdict, attempted simple burglary of an inhabited dwelling - a violation of La. R.S. 14:(27)62.2.

On June 22, 2018, in open court, Defendant filed a motion for new trial alleging newly discovered evidence, or in the alternative, a motion for post-verdict judgment of acquittal. After hearing arguments, the district court denied the motions, and Defendant waived sentencing delays. As set forth in the sentencing transcript, the district court sentenced Defendant to six months in jail, suspended, and placed him on one year of active probation plus cost, in the amount of $600.00 to the "JEF Fund," $100.00 to the indigent transcript fund, and $300.00 in court costs. As a condition of probation, the district court imposed a "stay away" order.[3]

Defendant moved for an appeal which was granted.

**ERRORS PATENT**

In accordance with La. C.Cr.P. art. 920, all appeals are reviewed for errors patent on the face of the record. Additionally, Defendant requests an error patent review of the record. After reviewing the record, we find no errors patent.[4]

---

[2] The trial transcript reflects that the State informed the district court that the misdemeanor charge of simple criminal damage to property, which was charged in the same bill as the felony, simple burglary of an inhabited dwelling, was improperly read to the jury as the misdemeanor was triable only by a judge. The State stated there had been no motion to sever the charges. The State requested the district court to instruct the jury not to consider any evidence of the simple criminal damage to property.

[3] The district court, at sentencing, did not expressly state when the stay away order would expire. However, the district court ordered that the stay away order be imposed as a condition of the one-year probationary period. Also, the record shows that Defendant signed the "Non-domestic Stay Away Order" which provides in part that "[t]his Stay Away Order remains in effect during the pendency of this case or unless and until lifted by the Judge and a minute entry indicating any such action."

2

**FACTS**

Defendant and Brittany Vegso[5] became romantically involved in the Spring 2014. Defendant proposed marriage to Ms. Vegso and she refused. Ms. Vegso claimed that a few days after she refused his marriage proposal, Defendant gave her his dog, Atticus; Defendant asserted he did not relinquish ownership of Atticus. On October 16, 2017, Defendant entered Ms. Vegso's home, without permission, and obtained Atticus.

The following pertinent testimony was elicited at trial.

During his relationship with Ms. Vegso, in the spring of 2016, Defendant purchased a puppy, Atticus. Defendant testified that he fed, medicated and cared for the dog. Defendant recounted that when he traveled for work, others would keep the dog including Ms. Vegso.

Defendant's relationship with Ms. Vegso was on and off, but ended in July 2016. Defendant testified that he and Ms. Vegso ran into each other at the Barkus parade in February 2017, and spent the day together. Defendant recalled that Ms. Vegso contacted him, at the end of March 2017, and asked him if she could watch

---

[4] The district court failed to advise Defendant of the time period to file post-conviction relief under La. C.Cr.P. art. 930.8 which requires the trial court to inform a defendant of the delays for filing post-conviction relief; however, this language is merely precatory and does not bestow an enforceable right upon an individual defendant. *State ex rel. Glover v. State*, 93-2330, 94-2101, 94-2197, p. 21 (La. 9/5/95), 660 So.2d 1189, 1201; *State v. Handy,* 01-0005, p. 5 (La. App. 4 Cir. 1/24/01), 779 So.2d 103, 105. Nevertheless, in the interest of judicial economy, this Court hereby notifies Defendant that La. C.Cr.P. art. 930.8 generally requires that application
ns for post-conviction relief be filed within two years of the finality of a conviction. *See State v. McDonald*, 02-2347, p. 2 (La. App. 4 Cir. 2/19/03) 841 So.2d 38, 38.

[5] This Court used the spelling "Vegso" as set forth in the charging instrument which differs from the spelling used in the trial transcript.

3

Atticus for him. Trial testimony indicated Ms. Vegso owned a home in New Orleans, Louisiana.[6]

On April 6, 2017, Defendant proposed marriage to Ms. Vegso, and she refused. Defendant testified that a few days after he proposed marriage to Ms. Vegso, he gave Atticus to Ms. Vegso for her to watch while he was traveling out of town for his job until he could move into the house he was repairing. At that time, Defendant was living in Baton Rouge, Louisiana. Defendant stated that Ms. Vegso took care of Atticus from the first weekend of April 2017 until October 16, 2017. While Atticus was staying with Ms. Vegso, Defendant estimated that he saw Atticus eight or nine times. Defendant explained that when he was able to come to New Orleans, he would get Atticus and take the dog for a walk or go to the park with him. Defendant recounted that he intended to get the dog back in July 2017, but Ms. Vegso took the dog to Pennsylvania without telling him. According to Defendant, in August 2017, he asked for Atticus back, but Ms. Vegso asked him if she could take the dog on another trip, and Defendant relinquished.

Vanessa Leeson, Defendant's mother, testified that Defendant purchased Atticus as a puppy. Ms. Lesson stated that she looked after Atticus for months at a time when Defendant's work required him to travel. She explained that Defendant would reimburse her for Atticus' care including the dog's visits to the veterinarian for shots and heartworm medicine. Ms. Leeson recalled Defendant's proposal of marriage to Ms. Vegso, and that after the proposal, while Defendant was traveling,

---

[6] Defendant stated that he had paid for some repairs to Ms. Vegso's home such as the foundation, the windows, electrical work, other minor repairs, and the shed in Ms. Vegso's backyard. Defendant stated Ms. Vegso gave him power of attorney to sign the paperwork to purchase house.

4

she cared for Atticus part of the time, and Ms. Vegso cared for the dog the rest of the time. Ms. Leeson testified she never doubted that Defendant owned Atticus.

Michah Gill, one of Defendant's friends, testified she had no reason to believe that Defendant gave Atticus to Ms. Vegso. Ms. Gill stated that she and her children often cared for Atticus whenever Defendant's work required him to travel; she estimated she took care of Atticus once a month, ranging from three to fifteen days. When Ms. Gill cared for Atticus, Defendant supplied Atticus' food, toys, water and food bowls, and a leash. Ms. Gill recalled that she kept Atticus the last week in March 2017, and Defendant picked up Atticus from her on April 6, 2017. Ms. Gill testified she was aware Defendant proposed to Ms. Vegso the afternoon of April 6, 2017, and that Ms. Vegso had refused. Ms. Gill recounted that on the night of April 6, 2017, she saw Atticus with Defendant at Defendant's home in Baton Rouge, Louisiana. She also stated that she saw Atticus again with Defendant on April 9, 2017, and, she did not see Atticus with Defendant again until October 2017.

Trent Mayo, Defendant's best friend for over ten years, testified that Defendant and Atticus had a special relationship.

Ms. Vegso testified that Defendant gave her Atticus along with his crate, bed, medications, and veterinarian papers following his proposal of marriage. Ms. Vegso stated that Atticus lived with her in her home located at 2515 St. Phillip in New Orleans, Louisiana from April 2017 until October 16, 2017. Ms. Vegso had two roommates, Anna Lindenmayer[7] and Ava Rodenrice. Ms. Vegso testified that after Defendant gave her Atticus, she paid for Atticus's rabies tag and general

[7] This Court used the spelling "Lindenmayer" as set forth in the charging instrument which differs from the spelling used in the trial transcript.

license and registered him in Orleans Parish on May 26, 2017. During her testimony, Ms. Vegso identified several documents. One was entitled "Orleans Parish Animal License" dated May 26, 2017, which indicated Ms. Vegso was Atticus' owner. The other was a letter "To Whom It Concerns" dated May 27, 2017, from Liz Friedman, a veterinarian, explaining why Atticus was not neutered at that time; the letter referred to Ms. Vegso as the dog's owner. Ms. Vegso recalled that after Defendant gave her the dog, she had Atticus microchipped in her name in August or September 2017, but that she did not turn in the paperwork for the microchip.

Ms. Vegso testified that she was not there when Defendant purchased Atticus, she was not listed as Atticus' owner on the bill of sale, and she had not paid for Atticus. Ms. Vegso recalled that she was making arrangements with Defendant, via text messages, to keep Atticus for Defendant in the later part of March 2017. She stated that when she kept Atticus, on previous occasions, Defendant would give her Atticus' food bowls. In addition, when Ms. Vegso was asked "[a]fter Mr. Leeson allegedly gave you Atticus[,] would he still come to the house to see the dog," she responded, "Yes, on one or two occasions."

Ms. Vegso said that Defendant sent her text messages demanding that she return Atticus in October 2017. Ms. Vegso refused and advised Defendant that Atticus belonged to her now. Ms. Vegso explained that, at that time, Atticus was at her home in New Orleans while she was in Florida. She told Defendant not to come to her home while she was not there.[8] On October 14, 2017, Defendant sent a text message to Ms. Vegso that he wanted to pick up the dog "tomorrow." Ms. Vegso responded: "No. [Defendant] he is my dog now. I will gladly pay you/your

---

[8] The text messages between Defendant and Ms. Vegso were introduced into evidence.

6

parents for what he cost from the breeder if you'd like." On October 15, Defendant sent a message asking if Ms. Vegso needed any work done around the house. Ms. Vegso responded, "No thank you. Please do not go to my house. Then, the following exchange occurred:

[Defendant] "Britney [sic], I'm taking my dog back."

* * *

[Ms. Vegso] "1. He's my dog. . . ."

[Defendant] "No. I'm asking you to do as you promised. If I don't get him back, I will take you to court over it . . . and all the expenses I put into your house . . . . Plus I'll add in Atticus and his training."

[Ms. Vegso] "[I] never promised anything about giving Atticus back."

* * *

[Defendant] "Britney[sic]. I'm not going to argue about this. I just want my dog back.

[Defendant] "Tell [B]ecca or [A]va I'll be there about 3:45. . . ."

[Ms. Vegso] "Do not go to my house."

[Defendant] "Please call your roommate and let her know I'm waiting in front of your house for my dog."

[Ms. Vegso] "No, I will call the police if you do not leave my property."

Ms. Vegso testified that on October 16, 2017, Defendant broke into her house. That day, in a text message to Ms. Vegso, Defendant wrote that "[y]our roommate tackled me through a window[.] The dog and I both have cuts from it . . . ." At trial, Ms. Vegso stated that since October 16, 2017, she has not been in possession of Atticus; also, she has not seen Atticus or Defendant.

On the night of the incident, October 16, 2017, New Orleans Police Officer ("NOPD"), Cody O'Dell, responded to a report of simple burglary at Ms. Vegso's

residence. At the scene, Officer O'Dell observed a broken front window, a broken flower pot on the front porch, and an open side window which was missing a screen. Following, the officers from NOPD spoke with Ms. Lindenmayer, a neighbor, and Ms. Vegso. Defendant was identified as the perpetrator, and a warrant was obtained for Defendant's arrest.

Ms. Lindenmayer, Ms. Vegso's roommate, testified she and Atticus were at the house on St. Phillip on October 15 and 16, 2017. On October 15, 2017, Defendant knocked on the door and asked for Atticus. Ms. Lindenmayer informed Defendant the dog was with a friend. Defendant responded that he would stay and wait for the dog on the porch of the house. Ms. Lindenmayer told him no and to contact Ms. Vegso. She recalled Defendant left the home and drove away. Ms. Lindenmayer advised Ms. Vegso what had occurred.

During the night on October 16, 2017, Ms. Lindenmayer was awakened by a noise in front of the house. As she walked into the front of the house, she noticed that the front door was open, and Atticus had run outside. She chased Atticus and led him back into the house and locked the door. A short while later, she heard a tapping noise on the kitchen window. When she pulled the kitchen curtain aside, Defendant was standing on top of the chain link fence outside. Defendant pulled the screen from the window, opened the window, and stepped inside the kitchen. Defendant, then, told Ms. Lindenmayer he was taking Atticus. According to Ms. Lindenmayer, she ordered Defendant to leave. As she searched for her cell phone, Defendant grabbed her cell phone first and offered to exchange it for Atticus. A struggle ensued. Ms. Lindenmayer tackled Defendant through a window to force him out of the house. Defendant, followed by Atticus, ran. Ms. Lindenmayer testified that she chased Defendant down the street while yelling "he stole our

dog," but she was unable to stop him. In the commotion, she noticed a SUV, which she assumed Defendant was driving, idling in the street with the key in the ignition. Ms. Lindenmayer testified she removed the key from the SUV to prevent Defendant's escape with Atticus, but Defendant, returned to the SUV, took the key from Ms. Lindenmayer, and drove away. Ms. Lindenmayer photographed the SUV's license plate while a neighbor called the police.

Defendant denied climbing through the kitchen window and stated the collapsing fence would not have supported him; instead, he testified that Ms. Lindenmayer opened the door after he knocked. Defendant testified in pertinent part:

> When I got there [Brittany's home] I saw the lights were on and somebody's car was out front so I went up and knocked on the front door and Anna answered. I lied to Anna, and I told her I had talked with Brittany, and I was there to see my dog because I had done that basically all summer. . . . [H]e had barked when I knocked on the door, and run up behind her and so she opened the door, and was like well he's right in here. . . . [I] told Anna, I was like, I'm just gonna' take my dog . . . Anna got like real, real mad and screamed no, you can't have the dog and (Crying) sorry, she grabbed him by the collar like this, into his neck and just started dragging him down . . . towards the hallway out of the kitchen so I reached down and undid the little clasp like that and so he got let free. . . .[A]tticus starting running around the living room and that was when Anna said she was going to call the cops and I said, you know what, I'm done. I can, I'll sort this out with Brittany when she comes back next weekend. . . . [S]o I turned to leave and while I was walking out towards the door Anna screamed to me no, you can't leave, you have to wait for the cops to get here . . . as I walked around the edge of the couch [Ms. Lindenmayer] tackled me from behind and I went through the window . . . I ran down the steps. When I ran down the steps Atticus hopped out the window and came with me. . . .When I got back around to the car I was in, it was my roommate's car . . . [Ms. Lindenmayer] had broken into the car and taken the keys out of it and was holding them up and when I came to . . . get them [,] she pinned me up against the car with her forearm and was basically just holding me there when the neighbor came up and when the neighbor came up he kind of hey, whoa, what's going on and got things kind of deescalated a little bit when that happened [Ms. Lindenmayer] backed off of me and I just grabbed the keys, opened the door and before I could get in Atticus

9

jumped in the passenger seat so I closed the door, started the car and drove off. Once I got to the interstate[,] I called Brittany and she screamed at me the same thing she texted to me and I haven't really had any contact with her since.

Defendant explained that he did not need to go through the window because he had a spare key to Ms. Vegso's home, he knew where the other spare key was kept, and he knew the alarm code.

Defendant testified Atticus has been in his possession since October 16, 2017, and Defendant obtained routine veterinary care for Atticus. At trial, Defendant identified the report from Atticus' veterinarian visit dated 10/31/2017. In the report, the dog was referred to as "Atticus Leeson." Defendant recalled that the veterinarian could not locate any other microchip in the dog; thus, Defendant had Atticus microchipped.

## DISSCUSSION

Defendant essentially assigns two errors: (1) the State presented insufficient evidence to support his conviction; and (2) the district court abused its discretion in denying his motion for new trial.

*Assignment of error no. 1 (sufficiency of the evidence)*:

Defendant asserts he was denied his right to due process of the law as there was insufficient evidence to support the guilty verdict. Defendant argues the State failed to prove, beyond a reasonable doubt, the essential elements of attempted simple burglary of an inhabited home. Defendant prays his conviction and sentence be reversed.

When issues are raised on appeal as to the sufficiency of the evidence and as to one or more trial errors, the reviewing court should first determine the sufficiency of the evidence. *State v. Simonson*, 14-0950, p. 5 (La. App. 4 Cir.

10

3/4/15), 163 So.3d 37, 41-42 (citations omitted). In reviewing a claim of sufficiency of the evidence, appellate courts are controlled by the standard set forth in *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781 (1979), and "must determine that the evidence, viewed in the light most favorable to the prosecution, was sufficient to convince a rational trier of fact that all of the elements of the crime had been proved beyond a reasonable doubt." *State v. Ennis*, 11-0976, pp. 4-5 (La. App. 4 Cir. 7/5/12), 97 So.3d 575, 579 (quoting *State v. Brown*, 03-0897, p. 22 (La. 4/12/05), 907 So.2d 1, 18). "'[E]vidence sufficient to support the charged offense will be deemed to be sufficient to support the responsive verdict where the defendant does not object to the inclusion of the responsive verdict.'" *State v. Alverez*, 13-1652, p. 6 (La. App. 4 Cir. 12/23/14), 158 So.3d 142, 148 (quoting *State v. Colbert*, 07-0947, p. 13 (La. App. 4 Cir. 7/23/08), 990 So.2d 76, 84-85).[9] In applying the *Jackson* standard, ""[t]he appellate court is not to determine whether it 'believes the witnesses or whether the conviction is contrary to the weight of the evidence,' but rather it is to consider the record as a whole, and if rational triers of fact could disagree as to the interpretation of the evidence, the conviction should not be disturbed." *Simonson*, 14-0950, p. 6, 163 So.3d at 41 (citing S*tate v. Peters*, 12-1641, p. 16 (La. App. 4 Cir. 8/21/13), 123 So.3d 307, 316, quoting *State v. Taylor*, 12-0345, pp. 18-19 (La. App. 4 Cir. 6/26/13), 118 So.3d 65, 77).

Defendant was charged with simple burglary of an inhabited dwelling and the jury returned a responsive guilty verdict of attempted simple burglary of an

---

[9] In *State v. Berry*, 09-1567, p. 9 (La. App. 4 Cir. 7/21/10), 44 So.3d 819, 824, n.5 (citation omitted), this Court noted that "[c]ompromise verdicts are permissible, whether or not the evidence supports the compromise verdict, as long as the verdict comports with the legislative scheme of La.C.Cr.P. art. 814 and the evidence is sufficient to sustain a conviction on the charged offense."

inhabited dwelling. La. R.S. 14:62.2 provides that "[s]imple burglary of an inhabited dwelling is the unauthorized entry of any inhabited dwelling, house, apartment, or other structure used in whole or in part as a home or place of abode by a person or persons with the intent to commit a felony or any theft therein, other than as set forth in R.S. 14:60." La. R.S. 14:27 defines attempt as, "[a]ny person who, having a specific intent to commit a crime, does or omits an act for the purpose of and tending directly toward the accomplishing of his object is guilty of an attempt to commit the offense intended; and it shall be immaterial whether, under the circumstances, he would have actually accomplished his purpose."

The appellate record does not indicate Defendant objected to the inclusion of the responsive verdicts; thus, we will review, under the *Jackson* standard, whether sufficient evidence was presented by the State to support the charged offense—simple burglary of an inhabited dwelling. *Alverez*, 13-1652, p. 6, 158 So.3d 142, 148.

The three elements that the State must prove beyond a reasonable doubt to establish the crime of simple burglary of an inhabited dwelling are (1) unauthorized entry by the offender, (2) of an inhabited dwelling, and (3) with the intent to commit a felony or theft. La. R.S. 14:62.2. Criminal specific intent—"'that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act'"—is an essential element of this crime. *State v. Agee*, 08-0203, p. 6 (La. App. 4 Cir. 7/23/08), 990 So.2d 95, 98-99 (citing *State v. Chairs,* 99-2908, p. 9 (La. App. 4 Cir. 2/7/01), 780 So.2d 1088, 1095, and quoting La. R.S. 14:10(1)). Defendant does not contest the second element; he only challenges that the State failed to prove beyond a reasonable doubt the first and third elements.

Defendant contends the State failed to prove the first element beyond a reasonable doubt—his unauthorized entry into Ms. Vegso's home. Defendant asserts the State failed to rebut his testimony that it was not possible for him to stand on the Ms. Vegso's fence to climb through the window because the fence was collapsing. Defendant points out that there was no reasonable reason for him to climb through a window to enter Ms. Vegso's home because he had been coming by Ms. Vegso's home all summer and had a spare key to her home.

Regardless of how Defendant entered the home, the evidence reflects his entry was unauthorized. Ms. Vegso testified she owned the home. On the dates surrounding the entry to the home by Defendant, Ms. Vegso testified she told Defendant not to enter her residence. Text messages between Ms. Vegso and Defendant supported Ms. Vegso's testimony.[10] In addition, Defendant's testimony that he had a spare key or knew where the spare key to the home was located does not equate to permission from Ms. Vegso for Defendant to enter her home. Further, although Defendant alleged Ms. Lindenmayer opened the door for him when he knocked, which was disputed, testimony by Ms. Lindenmayer and Defendant reflects Ms. Lindenmayer did not give Defendant permission, implied or direct, to enter the home. Consequently, applying the *Jackson* standard, we conclude the State proved beyond a reasonable doubt the first element—Defendant's entry was unauthorized.

Next, Defendant asserts the State failed to prove the third element—intent to commit a felony or theft—beyond a reasonable doubt. The State asserted Defendant entered Ms. Vegso's home with the intent to take Atticus. The essential

---

[10] Defendant admitted that after Ms. Lindenmayer answered Ms. Vegso's door, he "lied" to Ms. Lindenmayer telling her he had spoken to Ms. Vegso and was there to see the dog.

elements of theft are "(1) that the defendant misappropriated or took by means of fraudulent conduct, practices, or representations; (2) a thing of value; (3) that belonged to another; and (4) that the defendant had the [criminal specific] intent to deprive the owner permanently of that which was misappropriated or taken." *State v. Biddy*, 13-0356, p. 12 (La. App. 4 Cir. 11/20/13), 129 So.3d 768, 776-77 (citations omitted); La. R.S. 14:67.[11]

Defendant argues that the State failed to prove his intent to take property belonging to another because Atticus belonged to him. Defendant cites *State v. Authement*, 139 La. 1070, 72 So. 739. 741 (La. 1916), wherein the Supreme Court held that one taking property under a bona fide claim of right, and not with any intent of theft, is not guilty of larceny.

In support of his argument, Defendant highlights his testimony that he purchased Atticus, and his name appears on the bill of sale. Defendant asserts that Ms. Gill's and Ms. Leeson's testimonies confirmed that they helped take care of Atticus when Defendant was out of town, and he did not give Atticus to Ms. Vegso. Defendant argues "[m]erely because the dog stayed with [Ms.] Vegso from April of 2017-October of 2017 is not sufficient to show Mr. Leeson relinquished his ownership rights in Atticus." Defendant contends undisputed testimony was presented that he visited Atticus while Ms. Vegso was keeping the dog, and Ms. Vegso asked his permission to take Atticus on a trip at the end of the summer of 2017. In addition, Defendant points out that he, as well as Ms. Vegso, produced separate bills from veterinarians listing themselves as Atticus's owner. Finally,

---

[11] In *State v. Pittman*, 368 So.2d 708, 710 (La. 1979), the Supreme Court explained that "[c]oncerning attempted theft (LSA-R.S. 14:27), a person who has the specific intent to commit a theft and who does or omits an act for the purpose of accomplishing the same is guilty of an attempt to commit the offense intended, and it is immaterial whether under the circumstances he would have actually accomplished his purpose."

Defendant asserts that Ms. Vegso "lied" about putting a microchip in Atticus in her name which casts doubt on Ms. Vegso's testimony.

In *State v. Mussall*, 523 So.2d 1305, 1311 (La. 1988)(quoting 2 C. Wright, Federal Practice & Procedure, Criminal 2d, § 467, at 660-661 & n. 23 (2 ed. 1982)) the Supreme Court explained in reviewing a sufficiency of the evidence claim that "'the court is not to substitute its judgment of what the verdict should be for that of the jury, but that at the same time the jury cannot be permitted to speculate if the evidence is such that reasonable jurors must have a reasonable doubt.'" The Supreme Court, in *State v. Higgins*, 03-1980, pp. 17-18 (La. 4/1/05), 898 So.2d 1219, 1232, wherein the sufficiency of the evidence was challenged by the defendant, opined in pertinent part:

> The trier of fact makes credibility determinations and may, within the bounds of rationality, accept or reject the testimony of any witness; thus, a reviewing court may impinge on the fact finder's discretion "only to the extent necessary to guarantee the fundamental protection of due process of law." *Mussall,* 523 So.2d at 1310. The due process standard of review under *Jackson,* 443 U.S. at 319, 99 S.Ct. at 2789, does not sanction juror speculation if the evidence is such that a reasonable factfinder must have a reasonable doubt. *State v. Lubrano,* 563 So.2d 847, 850 (La.1990).

Viewing the evidence presented in the light most favorable to the State, we conclude that the record does not support a finding beyond a reasonable doubt that Defendant had specific intent to take property belonging to another. "A reasonable and honest belief that one owns an interest in property precludes a finding that he intended to permanently deprive the owner of the property." *State v. Henry*, 46,406, p. 12 (La. App. 2 Cir. 8/10/11), 73 So.3d 958, 966 (citation omitted). The evidence adduced at trial was such that reasonable jurors must have a reasonable doubt that Defendant relinquished ownership of Atticus to Ms. Vegso. Although Ms. Vegso identified at trial the "Orleans Parish Animal License" and a letter from

15

a veterinarian indicating she was Atticus' owner, Defendant also presented a veterinarian's report showing he was Atticus' owner. In addition, the following undisputed facts were presented at trial showing Defendant had a reasonable and honest belief that he owned Atticus:

- Defendant purchased Atticus;

- Testimony from multiple witnesses indicated when Defendant traveled he had his friends, family or Ms. Vegso care for Atticus;

- In the later part of March 2017, Ms. Vegso was making arrangements with Defendant, via text messages, to keep Atticus for Defendant;

- While Ms. Vegso was keeping Atticus between April 2017 and October 2017, Defendant visited Atticus;

- In August 2017, Ms. Vegso asked Defendant if she could take Atticus on a trip;

- The October 2017 text messages showed Ms. Vegso offered to pay Defendant and Defendant's parents for what "[Atticus] cost from the breeder";

- Both Defendant and Ms. Vegso testified since October 16, 2017, Atticus remains with Defendant; and

- Following October 16, 2017, Defendant had Atticus microchipped in his name.

Because we have determined that any rational trier of fact necessarily must have a reasonable doubt as to the third element—intent to commit a theft, we conclude that the evidence is insufficient to support a conviction of the charged offense, simple burglary of an inhabited dwelling, or the responsive verdict returned by the jury, attempted simple burglary of an inhabited dwelling.

Nevertheless, that finding does not end this Court's review. In *State v. Higgins*, 03-1980, p. 18, 898 So.2d at 1232 (citations omitted), the Supreme Court explained that "under *State v. Byrd*, 385 So.2d 248 (La. 1980), and La. Code Crim.

Proc. art. 821(E), discharge of the defendant is neither necessary nor proper when the evidence presented at trial does not support the verdict returned but does support a responsive verdict or lesser included grade of the offense." The verdicts responsive to simple burglary of an inhabited dwelling set forth in La. C.Cr. P. art. 814 are: guilty; guilty of attempted simple burglary of an inhabited dwelling; guilty of unauthorized entry of an inhabited dwelling; guilty of attempted unauthorized entry of an inhabited dwelling; and not guilty. We find that the evidence, subjected to the *Jackson* standard, supports a conviction of unauthorized entry of an inhabited dwelling, which is responsive. As we find Defendant's remaining assignment of error, which will be discussed *infra*, lacks merit, we vacate Defendant's conviction and sentence of attempted simple burglary of inhabited dwelling, and modify the jury's verdict of guilty to unauthorized entry of an inhabited dwelling - a violation of La. R.S. 14:62.3. Further, the matter is remanded to the district court for sentencing on the modified judgment as set forth in La. R.S. 14:62.3.[12]

*Assignment of error no. 2 (denial of motion for new trial)*:

Defendant complains the district court erred by denying his motion for new trial based on newly discovered evidence to rebut or impinge Ms. Vegso's testimony that she had Atticus microchipped. The newly discovered evidence was presented to the district court in the form of an affidavit from Defendant attesting that Dr. Rosie Kelly from the Animal Care Center of Gonzales would testify that "a full body scan of Atticus" revealed one chip which Dr. Kelly implanted at the

---

[12] La. R.S. 14:62.3(B) provides that "[w]hoever commits the crime of unauthorized entry of an inhabited dwelling shall be fined not more than one thousand dollars or imprisoned with or without hard labor for not more than six years, or both." Additionally, La. C.Cr.P. art. 893 allows a court to defer, in whole or in part, the imposition of a sentence after conviction of a first offense noncapital felony under the conditions set forth in paragraph (E) of art. 893.

request of Defendant, and it is not possible for a "microchip to disappear once implanted."[13]  Defendant urges that the result of the scan—no microchip being found in Atticus—was contrary to what Ms. Vegso testified and showed Ms. Vegso lied at trial.

In *State v. Parker*, 16-1166, p. 10 (La. App. 4 Cir. 12/12/18), 259 So.3d 1112, 1119-20, this Court explained what a defendant must show to obtain a new trial based on newly discovered evidence:

> To obtain a new trial based on newly discovered evidence, defendant must show "(1) the new evidence was discovered after trial; (2) the failure to discover the evidence at the time of trial was not caused by lack of diligence; (3) the evidence is material to the issues at trial; and (4) the evidence is of such a nature it would probably have produced a different verdict." [*State v. Tucker*, 2013-1631, p. 50 (La. 9/1/15), 181 So.3d 590, 626]. In evaluating whether newly discovered evidence warrants a new trial, the test is not simply whether another jury might bring in a different verdict, but whether the new evidence is so material it ought to produce a different verdict. A district court's decision on a motion for new trial based on newly discovered evidence, although a question of law, is entitled to great weight and should not be disturbed on review if reasonable persons could differ as to the propriety of the decision [La. C.Cr.P. art. 851; *State v. Prudholm*, 446 So.2d 729 (La. 1984)].

*See also State v. Coleman*, 12-1408, p. 15 (La. App. 4 Cir. 1/8/14), 133 So.3d 9, 21 (citing *State v. Quimby,* 419 So.2d 951, 960 (La.1982) (wherein this Court held

---

[13] Defendant's affidavit attested in part:

> (1) Notwithstanding the exercise of reasonable diligence by me, the new evidence was not discovered before or during trial.

> (2) The witness who will testify is Dr. Rosie Kelly from the Animal Care Center of Gonzales.

> (3) The newly discovered evidence consists of a full-body scan for multiple microchips of Atticus and the likelihood of a previously implanted microchip disappearing.  These two facts indicate that Brittany Vegso was untruthful in her testimony, which is also newly discovered evidence.

> (4) The facts which the witness will establish is that there was only one microchip found in Atticus, which I had implanted.  Additionally, Dr. Kelly will testify that it is not possible for a microchip to disappear once implanted.

that "[t]he decision on a motion for new trial rests within the sound discretion of the trial judge, and its ruling will not be disturbed on appeal absent a clear showing of abuse.").

Defendant's affidavit presents no new evidence to warrant a new trial. The affidavit was merely cumulative of testimony and evidence presented at trial. The affidavit recounted Defendant's trial testimony that he took Atticus to the veterinarian in October 2017, and the veterinarian checked Atticus to see if he was microchipped. When a microchip was not found, Defendant had Atticus microchipped. As well, Defendant's trial testimony rebuts Defendant's assertion this was new evidence discovered after trial. Accordingly, we conclude that the district court did not abuse its discretion in denying Defendant's motion for new trial.

This assignment lacks merit.

## CONCLUSION

Defendant's conviction and sentence of attempted simple burglary of inhabited dwelling are vacated, a judgment of guilty to unauthorized entry of an inhabited dwelling is rendered, and the matter is remanded to the district court for sentencing on the modified judgment as set forth in La. R.S. 14:62.

**CONVICTION AND SENTENCED FOR ATTEMPTED SIMPLE BURGLARY OF AN INHABITED DWELLING VACATED; JUDGMENT OF GUILTY OF UNAUTHORIZED ENTRY OF AN INHABITED DWELLING RENDERED; REMANDED TO THE DISTRICT COURT FOR SENTENCING**